# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| USA,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>ROSENDO VALDIVIAS-SOTO,<br><br>　　　　　Defendant. | Case No.  18-cr-00505-BLF-1<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>[Re:  ECF 38] |

Defendant Rosendo Valdivias-Soto, a Spanish-speaking Mexican national, is charged in a single-count indictment for violating 8 U.S.C. § 1326(a), which prohibits unlawfully reentering the United States after deportation. *See* Indictment, ECF 2. Mr. Valdivias moves to dismiss the indictment on the grounds that his prior removal order was fundamentally unfair by violating his due process rights and therefore cannot serve as the predicate for this unlawful reentry prosecution. *See* Mot., ECF 38. The Government opposes Mr. Valdivias's motion. *See* Opp'n, ECF 41. The Court has considered the parties' briefing, evidentiary record, oral arguments presented at the September 29, 2020 hearing, and the applicable law. For the reasons that follow, the Court finds that Mr. Valdivias has successfully collaterally attacked his 2012 removal order under 8 U.S.C. § 1326(d) and GRANTS his motion to dismiss the indictment.

## I.     BACKGROUND

### A. Childhood and family life

Mr. Valdivias, the sixth of ten children, grew up on a cattle ranch in the rural community of Tumbiscatio de Ruiz, Michoacan, Mexico, an eight-hour trip away from the nearest town or

United States District Court<br>Northern District of California

United States District Court
Northern District of California

medical clinic. Ex. B, Report of Dr. Shelley Peery ("Peery Report") 31, ECF 38-2. His childhood home did not have running water or electricity. *Id.* His community did not have a schoolteacher at the time he was school-aged, so he never learned to read or write. *Id.* He started working on his parents' ranch when he was approximately six years old, caring for animals, planting corn, building fences, and making tortillas. *Id.* 32.

Around this time, he was sexually abused by an aunt who stayed with the family for approximately three months after the murder of her husband, the brother of Mr. Valdivias's mother. Peery Report 32. He did not tell anyone at the time due to shame and fear his aunt would be mad at him. *Id.* Mr. Valdivias's sister reported to Dr. Peery that her brother had worms around the time he was five-to-seven years old. *Id.* Medical records from 2003 indicate Mr. Valdivias has cysticercosis calcifications in his brain, which result from tapeworm larvae ingested as eggs from contaminated food, water, or surfaces contaminated with feces. Ex. A, Medical Records 11, ECF 38-2.

Mr. Valdivias suffered a traumatic brain injury when he was around twelve or thirteen years old. Peery Report 32. He was struck by a fast-moving car while crossing the street. *Id.* He was unconscious for at least a week, and he was hospitalized for several weeks. *Id.* When he regained consciousness, he could not recognize his family members for approximately one week. *Id.* He could not work for several months and reported that he did not feel "normal" for four-to-five months after the accident. *Id.*

When he was approximately fifteen years old, his father died, making his family more reliant on his labor. Peery report 33. He also traveled ten-to-fourteen hours on horseback to work on his aunt's ranch as well. *Id.* 32. It was in his aunt's village that he met his partner, Angelica Vargas, when they were in their early teens. *Id.* at 33. They have now been together for twenty-three years and have lived in California together since 2000. Ex. F, Decl. of Angelica Vargas-Soto ¶ 2, ECF 38-2. They have seven children together. *Id.* At least three of their children are United States citizens. *Id.* ¶ 7. Their oldest son, now seventeen years old, has Type 1 diabetes, a condition that requires attentive care. *Id.* ¶¶ 11–12. Twenty-six of their adult relatives are either United States citizens or lawful permanent residents. *Id.* ¶ 11.

Mr. Valdivias has worked consistently to provide for his family since his arrival to the United States. Decl. of Angelica Vargas-Soto ¶ 8. He has worked in construction, roofing, landscaping, restaurants, delivery, and he currently works at a machine shop in San Jose. *Id.*

**B. Additional Traumatic Brain Injuries Resulting From Crimes Committed Against Mr. Valdivias**

In 2002, Mr. Valdivias was attacked by an unknown assailant at night while walking near an East Palo Alto convenience store. Medicals Records 11; Ex. D., East Palo Alto Police Department Felony Report 59 ("East Palo Alto Police Report"), 38-2. He was hit in the head multiple times with a chain. Medical Records 11. He suffered skull fractures and lacerations that were treated with stitches and staples. *Id.* 11–12. He managed to run away after he saw a knife. Medical Records 18.

Mr. Valdivias was taken to the hospital by his brother-in-law, Arnoldo Vargas, and another adult relative the day after the attack. Ex. G, Decl. of Arnoldo Vargas ¶ 2, ECF 38-2; Medical Records 14, 18. Medical personnel in the emergency room submitted a "Suspected Violent Injury Report" to law enforcement. Medical Records 18. The East Palo Alto police department sent an officer to interview Mr. Valdivias at the hospital, and either his brother-in-law or other relative translated for him at his bedside. *Id.* His brother-in-law, Mr. Vargas, recalls being present during the police interview. Decl. of Arnoldo Vargas ¶ 3. Mr. Vargas recalls that Mr. Valdivias told the police officer that he did not know his attacker and thought that the attacker was either trying to rob him or had him confused with someone else. Decl. of Arnoldo Vargas ¶ 4. The assailant was never found. Mot. 3. The East Palo Alto police report notes that Mr. Valdivias was the victim of assault with a deadly weapon, a violation of Cal. Pen. Code § 245(a)(1) at a convenience store on December 29, 2002. East Palo Alto Police Report 59. The report notes that the police department had photographs of Mr. Valdivias's injuries as evidence. *Id.* 60. Those photographs have subsequently been destroyed. *Id.* 61.

In 2012, after Mr. Valdivias was deported to Mexico, he suffered another traumatic brain injury as a result of an attack and spent five days in the hospital. Ex. H, Letter from Physician and Translation 89–90, ECF 38-2; Peery Report 34. In 2015, back in the United States, Mr.

1   Valdivias's family home was burglarized, and he again cooperated with law enforcement in the

2   investigation. Ex. I, San Jose Police Department Narrative 91, ECF 38-2.

3        Mr. Valdivias was evaluated by a neuropsychologist in May 2020. *See* Peery Report. He

4   was diagnosed with Major Neurocognitive Disorder due to Traumatic Brain Injury, and the doctor

5   determined that he has previously suffered from Post-Traumatic Stress Disorder ("PTSD"). Peery

6   Report 43. The doctor reported that Mr. Valdivias's cognitive deficits have developed subsequent

7   to his 2002 traumatic brain injury. *Id.* 43–44. The doctor noted that these deficits were

8   "superimposed upon an already vulnerable brain that incurred a severe traumatic brain injury

9   around the age of twelve." *Id.* at 43. Mr. Valdivias "does not possess the attentional focus and

10  working memory to understand complex information. His multitasking abilities are too limited to

11  deliberate among options when engaging in novel or complex problem solving." *Id.*

12      **C.  Immigration and Criminal History**

13       Mr. Valdivias has several misdemeanor convictions and one felony conviction that would

14  be a misdemeanor today. His misdemeanor convictions are as follows: DUI with injury, 2002; hit

15  and run causing property damage, 2004; DUI, 2007; and two convictions for driving with a

16  suspended license, 2007 and 2009. Ex. J Decl. of Lara Vinnard ¶¶ 3–7, ECF 38-3.  Mr. Valdivias

17  was voluntarily returned to Mexico in 2009. Ex. K 2, ECF 38-4. Mr. Valdivias's felony conviction

18  came in 2011, for conspiring to cultivate marijuana, in violation of Cal. Pen. Code § 182. Ex. L,

19  Judgment 4, ECF 38-4. This is a misdemeanor in California today. *See* Cal. Health & Saf. Code §

20  11358(c).

21       According to the criminal complaint, Mr. Valdivias and Cleofas Vargas-Soto, his brother-

22  in-law, drove a vehicle to a marijuana farm in Mendocino National Forest, and the car contained

23  food, a handgun, and marijuana seeds. Ex M., Compl. 6, ECF 38-4. According to the Forest

24  Service report, Mr. Valdivias was the passenger in the vehicle. Ex. N, USDA Forest Service

25  Supplemental Incident Report 9, ECF 38-4. It appears that Mr. Valdivias was only present in the

26  car because he was very familiar with the area. *Id.* 10. He plead no contest and was sentenced to a

27  term of sixteen months incarceration on June 28, 2011. Judgment 4.

28

United States District Court
Northern District of California

1   In 2016, California voters passed Proposition 64, which rendered Mr. Valdivias's offense a
2   misdemeanor. Mot. 6; Cal. Health & Saf. Code § 11358(c). In 2018, the California legislature
3   passed Health & Saf. Code § 11361.9, requiring that the State identify *sua sponte* all past
4   marijuana convictions that qualify for reductions, expungements, and recall and re-designate those
5   cases accordingly. Mot. 6.

6   **D. 2012 Removal Proceedings**

7   While Mr. Valdivias was serving his sentence for conspiring to cultivate marijuana, the
8   Government served him with a Notice to Appear in removal proceedings. Ex. Q, Notice to Appear
9   31, ECF 38-4. On January 31, 2012, while in a room at the prison with other incarcerated persons,
10   Mr. Valdivias appeared via teleconference in front of immigration Judge Jack W. Staton. Mot. 7;
11   Ex. U, Tr. of Immigration Proceedings ("Removal Hearing Transcript") 1, ECF 38-4.[1] On his I-
12   263B Record of Sworn Statement form, there is a handwritten note that Mr. Valdivias cannot read
13   or write. Ex. S, I-263B 37, ECF 38-4. A Spanish interpreter was present for the hearing. *See*
14   Removal Hearing Transcript. Mr. Valdivias was not represented by counsel. Mot. 8; *See* Removal
15   Hearing Transcript.

16   At the beginning of the hearing, the immigration judge advised the respondents about their
17   right to counsel in removal proceedings. "At this and every hearing, gentlemen, you can have an
18   attorney, but the government will not pay for your attorney." Removal Hearing Transcript 1–2.
19   However, this was translated as, "Uh, in this proceeding and any other one that you have with
20   immigration, you can *hire* an attorney. The government does not pay for the service of an
21   attorney." Removal Hearing Transcript 2 (emphasis added). The immigration judge then said, "So,
22   if you want an attorney, you must find one for yourself at no expense to the government." *Id.* This
23   was translated as, "each one who, then, wants to *hire* an attorney goes and *hires* one at his own
24   expense." *Id.* (emphasis added). The immigration judge then said, "To help you find an attorney
25   should you want one, you have each been given a list of local legal services." *Id.* The translation
26   was substantively the same. *Id.* The immigration judge then said, "The people on that list have told

27

28

---

[1] The Government does not object to or challenge any portion of the transcript cited in this order.

*United States District Court*
*Northern District of California*

the court that they will takes cases for free or at low cost." *Id.* This was translated as "When the people signed up on the list, those attorneys indicate to the judge that they can do cases free of charge and others for a low fee." *Id.* This was the only reference to the possibility of pro bono representation.

Regarding the right to counsel on appeal, the immigration judge said, "You can have an attorney assist you on the appeal, even if you have no attorney in Immigration Court. But the government will not pay for that attorney." *Id.* 8. This was translated as, "And so in the appeal process, [if] you need an attorney to help, you, you *hire* one." *Id.* (emphasis added).

The immigration judge conducted a limited individual dialogue with Mr. Valdivias concerning his background, past immigration history, and marijuana conviction. *Id.* 9–23.  The government counsel stated that Mr. Valdivias's conviction was an aggravated felony. *Id.* 18–19. The immigration judge said, "So, it's an aggravated felony and so you are ineligible for *any* relief or remedy. I must order you removed" *Id.* 19 (emphasis added). When the immigration judge asked if he wanted to appeal, this discussion ensued:

> Immigration Judge: Do you understand that if you do appeal, the Board of Appeals could order that you go free and that you not be removed at all?
> Mr. Valdivias: Pues, como, no tengo ninguna chanza allí, ah, según oigo yo. ("Well, like, I don't have any chance there, uh, from what I'm hearing.")

*Id.* 22. After a brief further discussion, Mr. Valdivias stated that he did not want to appeal. *Id.* 23. The immigration judge issued a removal order. Ex. V, Removal Order 69, ECF 38-4. He was deported on or about February 12, 2012. Indictment 2.

Mr. Valdivias returned to the United States after his 2012 deportation. Indictment 2. The Indictment in the current case was issued on October 11, 2018. *Id.* 3.

## II.   LEGAL STANDARD

To convict a noncitizen criminal defendant of unlawful reentry under 8 U.S.C. § 1326, the government must prove that the noncitizen left the United States under order of exclusion,

United States District Court
Northern District of California

deportation, or removal, and then unlawfully reentered. *United States v. Cisneros-Rodriguez*, 813 F.3d 748, 755 (9th Cir. 2015). A noncitizen charged with unlawful reentry under § 1326 "has a Fifth Amendment right to collaterally attack his removal order because the removal order serves as a predicate element of his conviction." *United States v. Ubaldo–Figueroa*, 364 F.3d 1042, 1047 (9th Cir. 2004). That right is codified at 8 U.S.C. § 1326(d). *Cisneros-Rodriguez*, 813 F.3d at 755.

> To mount a collateral attack under § 1326(d),
>
> a defendant must, within constitutional limitations, demonstrate (1) that he exhausted all administrative remedies available to him to appeal his removal order, (2) that the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review, and (3) that the entry of the order was fundamentally unfair.

*Ubaldo–Figueroa*, 364 F.3d at 1048; *see* 8 U.S.C. § 1326(d). The law is clear that if Mr. Valdivias establishes the third requirement under § 1326(d), then the first two requirements are also met. *See Cisneros-Rodriguez*, 813 F.3d at 756; *see also United States v. Gomez*, 757 F.3d 885, 892 (9th Cir. 2014) (noting that "[a] defendant can establish the first two prongs of § 1326(d) by showing that he was denied judicial review of his removal proceeding in violation of due process").

"An underlying order is 'fundamentally unfair' if (1) a defendant's due process rights were violated by defects in her underlying deportation proceeding, and (2) she suffered prejudice as a result of the defects." *Cisneros-Rodriguez*, 813 F.3d at 756 (quoting *Ubaldo–Figueroa*, 364 F.3d at 1048). If Mr. Valdivias's removal order was entered in violation of his due process rights and he suffered prejudice as a result, he is deemed to have exhausted all the administrative remedies available to him and to have been deprived of the opportunity for judicial review. *Cisneros-Rodriguez*, 813 F.3d at 756. Accordingly, if Mr. Valdivias satisfies all three requirements of 8 U.S.C. § 1326(d), then he has successfully collaterally attacked the predicate removal order, and the unlawful reentry indictment must be dismissed.

## III. DISCUSSION

Mr. Valdivias challenges his 2012 removal order as a violation of his due process rights on

1   two grounds: he did not enter a knowing and voluntary waiver of his right to counsel, and he did

2   not enter a considered and intelligent waiver of his right to appeal. Mot. 19–22. The Government

3   argues the opposite and maintains that there was no due process violation. Opp'n 3–11. The Court

4   will analyze both. The Court finds that the Government has not met its burden in showing that Mr.

5   Valdivias validly waived his right to counsel, and the Government has not met its burden of

6   establishing a considered and intelligent waiver of the right to appeal, violating due process.

7   **A.  Waiver of the Right to Counsel for Individuals Subject to Removal Proceedings**

8          Mr. Valdivias claims that he did not validly waive his right to counsel. The Court agrees.

9          "Although there is no Sixth Amendment right to counsel in an immigration hearing,

10  Congress has recognized it among the rights stemming from the Fifth Amendment guarantee of

11  due process that adhere to individuals that are the subject of removal proceedings." *Tawadrus v.*

12  *Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004); *see also Arrey v. Barr*, 916 F.3d 1149, 1157 (9th

13  Cir. 2019) (stating, "Both Congress and our court have recognized the right to retained counsel as

14  being among the rights that due process guarantees to petitioners in immigration proceedings" and

15  citing 8 U.S.C. § 1362). Accordingly, "In any removal proceedings before an immigration judge

16  and in any appeal proceedings before the Attorney General from any such removal proceedings,

17  the person concerned shall have the privilege of being represented (at no expense to the

18  Government) by such counsel, authorized to practice in such proceedings, as he shall choose." 8

19  U.S.C. § 1362.

20         To ensure that indigent noncitizens have the opportunity to choose to secure pro bono

21  counsel, the Attorney General "shall provide for lists (updated not less often than quarterly) of

22  persons who have indicated their availability to represent pro bono [noncitizens] in proceedings"

23  and those lists must be provided to noncitizens and otherwise made generally available. 8 U.S.C. §

24  1229(b)(2). This obligation is further reflected in 8 C.F.R. § 1240.10(a)(1) and (a)(2), which state

25  that the immigration judge shall "[a]dvise the respondent of his or her right to representation, at no

26  expense to the government, by counsel of his or her own choice," § 1240.10(a)(1), and "[a]dvise

27  the respondent of the availability of pro bono legal services for the immigration court location at

28  which the hearing will take place, and ascertain that the respondent has received a list of such pro

United States District Court
Northern District of California

bono legal service providers." § 1240.10(a)(2). An immigration judge's failure to advise a noncitizen of the availability of pro bono counsel constitutes a violation of the regulation. *United States v. Morelos-Navarro*, 742 F. App'x 226, 228 (9th Cir. 2018). This procedural safeguard has been found so important that a violation requires reversal without a showing of prejudice. *See Montes-Lopez v. Holder*, 694 F.3d 1085, 1090–91 (9th Cir. 2012) (citing *Leslie v. Attorney Gen.*, 611 F.3d 171, 180–82 (3d Cir.2010)); *see also Pablo v. Barr*, 798 F. App'x 1017, 1018 (9th Cir. 2020) (vacating Board of Immigration Appeals (BIA) decision because the immigration judge failed to ascertain whether petitioner was aware of the availability of pro bono legal services in violation of applicable regulations). [2]

Any waiver of this right to counsel must be "knowing and voluntary." *United States v. Ramos*, 623 F.3d 672, 682 (9th Cir. 2010)). "The government bears the burden of proving valid waiver in a collateral attack of the underlying removal proceedings." *Cisneros-Rodriguez*, 813 F.3d at 756 (internal citation omitted). The Court must "indulge every reasonable presumption against waiver" and not presume acquiescence in the loss of fundamental rights, especially where an *uncounseled* individual purportedly waived his right to counsel. *Id.* Mr. Valdivias has two arguments regarding the violation of his right to counsel. First, due to translation errors, he received an incorrect advisement of the right to counsel, and his purported waiver of that right was not knowing and voluntary. Mot. 20. Second, the immigration judge did not give him a correct description of the free legal services list, which also invalidated his waiver of his right. Mot. 19–20; Reply 5–7. The Court first turns to the arguments regarding the adequacy of the translation.

### 1. Incorrect Translation

Mr. Valdivias argues that, while the immigration judge described his right to find or have

---

[2] A showing of prejudice is still required in the 8 U.S.C. 1326 unlawful reentry criminal prosecution context The prejudice requirement to dismiss an indictment for unlawful reentry under 8 U.S.C. 1326 "is rooted in the limitations on criminal defendants' right to collaterally attack the result of a prior proceeding. Such collateral attacks are generally not allowed, but there is an exception to this rule when the alleged procedural deficiencies in a prior proceeding unconstitutionally "foreclose judicial review." *Montes-Lopez v. Holder*, 694 F.3d 1085, 1093 (9th Cir. 2012).

an attorney at no cost to the government, the translator repeatedly interpreted this as the right to "hire" an attorney, which is a plainly substantive error. Mot. 20; Reply 3–4, 11–12. The Government responds that the interpreter's use of the word "hire" is not a due process violation because the interpreter properly advised Mr. Valdivias of his right to representation at no expense to the government—"put another way, the right to hire an attorney." Opp'n 4, 6–7. The Court agrees with Mr. Valdivias that the translation issues contributed to his invalid waiver of his right to counsel.

"It is long-settled that a competent translation is fundamental to a full and fair hearing." *Ramos*, 623 F.3d at 680 (quoting *Perez–Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2000)). An "incorrect or incomplete translation is the functional equivalent of no translation," *Perez–Lastor*, 208 F.3d at 778.

The immigration judge told Mr. Valdivias, "At this and every hearing, gentlemen, you can have an attorney, but the government will not pay for your attorney." Removal Hearing Transcript 2. However, this was translated as, "Uh, in this proceeding and any other one you have with immigration, you can *hire* an attorney. The government does not pay for the service of an attorney." *Id.* (emphasis added). The immigration judge then said, "So if you want an attorney, you must find one for yourself at no expense to the government." *Id.* This was translated as "Each one who, then, wants to *hire* an attorney goes and *hires* one at his own expense. *Id.* (emphasis added). The immigration judge then mentioned the list of local legal services: "To help you find an attorney should you want one, you have each been given a list of local legal services." *Id.* This was translated as, "And so, for that reason, to each one who would like to look for an attorney to *hire* one, a list of local legal services has been provided. *Id.* (emphasis added).

Later, when explaining the right to appeal, the immigration judge told Mr. Valdivias that "[y]ou can have an attorney assist you on the appeal, even if you have no attorney in Immigration Court. But the government will not pay for the attorney." Removal Hearing Transcript 8. This was translated as "[a]nd so in the appeal process, [if] you need an attorney to help you, you can *hire* one." *Id.* 8 (emphasis added).

Mr. Valdivias argues that the right to be represented at no cost to the government is not the

same as being told that if you want an attorney, you must go hire one yourself. Mot. 20; Reply 11–12. The Government responds by pointing to the text of 8 C.F.R. § 1240.10(a)(1), which states that the immigration judge shall, "Advise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation." *Id.*; Opp'n 4. The Government argues that the immigration judge, and the interpreter's translation, conformed with the regulation requirements.

The Court does not agree with the Government that the right to be represented "at no expense to the government" is functionally equivalent to "the right to hire an attorney," especially given 8 C.F.R. § 1240.10(a)(2), which requires the immigration judge to advise the noncitizen of the availability of pro bono legal services. The Government argues that this is a separate and distinct requirement, and the immigration judge had no obligation to describe the right to counsel as a right to a free attorney in the first instance. Even if the Court were to assume that is true, that still doesn't address the issue of whether the right to be represented at no expense to the government is functionally equivalent to telling a noncitizen that they have the right to hire an attorney. The Government has the burden of proving waiver. *Cisneros-Rodriguez*, 813 F.3d at 756, and the Court finds that it has not done so.

The Government urged the Court to consider the words of the late Justice Ginsburg in *Florida v. Powell*, 559 U.S. 50, 60, (2010) at the September 29, 2020 hearing for this motion (but did not make this argument in its opposition brief). In *Powell*, a *Miranda* case, Justice Ginsburg, writing for the Court, stated

> In determining whether police officers adequately conveyed the four [Miranda] warnings, we have said, reviewing courts are not required to examine the words employed "as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'convey[y] to [a suspect] his rights as required by Miranda.'"

559 U.S. at 60 (internal citation omitted). The Court takes the Government's suggestion. Mr. Valdivias, a man who never had the opportunity to attend school and cannot read or write in any

language, was told multiple times that he could hire an attorney and advised to read a list containing local legal services if he wanted to hire an attorney. Removal Hearing Transcript 2, 3, 8.

The Court finds the translation deficiencies in this case analogous to the translation deficiencies in *United States v. Botello-Rosales*, 728 F.3d 865 (9th Cir. 2013), a case cited by the Government at oral argument. In *Botello-Rosales*, a *Miranda* case that relies on *Powell*, the detective told Botello, in Spanish, "If you don't have the money to pay for a lawyer, you have the right. One, who is free, could be given to you," using the word "libre" for free. *Id.* at 867. The Ninth Circuit affirmed the district court's finding that "this usage of 'libre' to mean 'without cost' was not a correct translation." *Id.*

> "Libre" instead translates to "free" as in being available or at liberty to do something. Additionally, the phrasing of the warning—that a lawyer who is free could be appointed—suggests that the right to appointed counsel is contingent on the approval of a request or on the lawyer's availability, rather than the government's absolute obligation. While no "talismanic incantation" is required, such an affirmatively misleading advisory does not satisfy *Miranda's* strictures.

*Id.* (internal citations omitted).

In Mr. Valdivias's case, the translation was more "affirmatively misleading." The right to be represented at no cost to the government was translated as the right to hire an attorney. The Court finds this translation affirmatively misleading to the point where Mr. Valdivias could not make a knowing and voluntary waiver of his right to counsel.

The cases the Government cites in support of its arguments fall short of meeting this burden. First, the Government cites *Cisneros-Rodriguez* and the conversation between Cisneros and the ICE agent presiding over her removal proceedings. 813 F.3d at 757. The Record of Sworn Statement she signed stated that she had "the right to consult with an attorney." *Id.* Cisneros testified that the ICE agent had dissuaded her from hiring an attorney and that if she had not been dissuaded, she would have hired an attorney. *Id.* The Government attempts to paint this as an affirmative statement from the Ninth Circuit that the right is properly stated as "the right to hire an attorney." Opp'n 5. The Ninth Circuit was summarizing Cisneros's testimony, not making an

United States District Court
Northern District of California

affirmative statement on the right to counsel. In fact, the Ninth Circuit states the right in *Cisneros-Rodriguez* as "the right to consult with an attorney," not as the right to hire an attorney. *Cisneros-Rodriguez*, 813 F.3d at 757.

The Government also attempts to analogize to *United States v. Barraza-Leon*, 575 F.2d 218 (9th Cir. 1978), which predates the current regulatory scheme.[3]  In *Barraza-Leon*, the noncitizens were told "during the hearing this afternoon, you may, if you wish, be represented by an attorney or by some other qualified person who would speak and act in your behalf." *Id.* at 222. The Court does not find this functionally equivalent to what Mr. Valdivias was told, several times: if you want an attorney, go hire one.

The Court finds that this erroneous translation prevents the Government of meeting its burden to prove a valid waiver of the right to counsel.

### 2.   The List of Legal Services

Mr. Valdivias also argues that he was not properly advised about the list of pro bono legal services, as required by 8 C.F.R. § 1240.10(a)(2). Mot. 20; Reply 5–6. The Government contends the description of the list was sufficient. Opp'n 3–6. The Court disagrees with the Government and finds that the failure to describe the list of pro bono legal services contributed to the due process violation that occurred.

The regulation at issue is 8 C.F.R. § 1240.10(a)(2), which states that the immigration judge shall "Advise the respondent of the availability of pro bono legal services for the immigration court location at which the hearing will take place, and ascertain that the respondent has received a list of such pro bono legal service providers." The immigration judge presented the list as follows: "The people on that list have told the court that they will take cases for free or at low cost." Removal Hearing Transcript 2. This was translated as "When the people signed up on the list, those attorneys indicate to the judge that they can do cases free of charge and others for a low fee."

---

[3] *See Landon v. Plasencia*, 459 U.S. 21, 36 (1982) ("The Attorney General has since revised the regulations to require that, when qualified free legal services are available, the immigration law judge must inform the alien of their existence and ask whether representation is desired. 44 Fed. Reg. 4654 (Jan. 23, 1979) (codified at 8 CFR § 236.2(a) (1982)). As the United States concedes, the hearing would not comply with the current regulations.")

United States District Court
Northern District of California

United States District Court
Northern District of California

*Id.* In its opposition brief, the Government categorizes this list as "the list of pro bono and low-fee attorneys." The Court does not find either of the three descriptions accurate enough to convey the availability of pro bono representation to Mr. Valdivias, who is illiterate and completely dependent on the verbal description of the list.

Mr. Valdivias argues, persuasively, that the list is intended to be a list of free attorneys. Reply 6; Ex. BB, 62 FR 9072, p. 2, ECF 42-5. According to the final rule as published in the federal register, the rule "amends the regulations by permitting attorneys who provide free legal services to indigent aliens to apply to be included on the list." 62 FR 9072 (Feb. 28, 1997). The Government argued at the hearing that the final rule also states that attorneys included on the list will not be precluded from accepting cases for a fee. *Id*. "An attorney included on the list may continue serving a wide range of paying clients as *long as he or she agrees to represent indigent aliens on a pro bono basis.*" *Id.* (emphasis added). Mr. Valdivias was never told by the immigration judge that if he could not afford a lawyer, the attorneys on the list would represent him for free. The Court finds this omission significant. Telling a man who can't read, and who has already been told several times that he had the right to hire an attorney, that the list contains lawyers who take cases for free or at low cost is not that same as telling him that there is a free attorney on the list if he cannot afford to pay. Whether Mr. Valdivias, who is now represented by the Federal Public Defender, was found indigent or not is beside the point. Had he been properly informed about the list and invoked his right to counsel, the hearing would have immediately stopped and been continued. Mr. Valdivias was never given the opportunity to properly weigh his decision.

The Court finds that the immigration judge did not properly inform Mr. Valdivias of the nature of the list of local legal services, where every attorney listed would take an indigent noncitizen's case for free. This error further supports the Court's finding of a violation of due process.

Additionally, the combination of the two errors—1) advising Mr. Valdivias that he could "hire" an attorney, and 2) failing to advise him that he lawyers on the list will represent indigent persons for free—is a denial of Due Process even if each error alone might not rise to that level.

### 3. Conclusion

Mr. Valdivias has satisfied his burden under Section 1326(d)(3) to show a due process violation based on his invalid waiver of his right to counsel. The Court next considers his waiver of his right to appeal.

### B. Waiver of Right to Appeal

"A waiver of the right to appeal a removal order does not comport with due process when it is not 'considered and intelligent.'" *Ubaldo-Figueroa*, 364 F.3d at 1048. The Government must establish a valid waiver by clear and convincing evidence. *United States v. Pallares-Galan*, 359 F.3d 1088, 1097 (9th Cir. 2004). Courts should 'indulge every reasonable presumption against waiver,'" and should "'not presume acquiescence in the loss of fundamental rights.'" *United States v. Gomez*, 757 F.3d 885, 894 (9th Cir. 2014) (quoting *United States v. Ramos*, 623 F.3d 672, 680 (9th Cir.2010)). "We carefully abide by this principle, especially where an *uncounseled* individual purportedly waived his right to appeal." *Gomez*, 757 F.3d at 894.

Mr. Valdivias argues that his wavier was neither considered nor intelligent and therefore not valid for several reasons.[4] The Court will start with Mr. Valdivias's argument that the immigration judge committed legal error with respect to Mr. Valdivias's eligibility for relief. Mot. 21–22.

### 1. Legal Error by the Immigration Judge

Mr. Valdivias argues that his due process rights were violated because the immigration judge affirmatively misled him when he said, "you are ineligible for any relief or remedy." Removal Hearing Transcript 19. The Government argues no legal error was committed because the immigration judge's requirement to inform Mr. Valdivias of apparently eligibility for relief under 8 C.F.R. § 1240.11(a)(2) was not triggered because no facts in the record reasonably suggested the possibility of relief. Opp'n 8–11. The Government, though, misconstrues Mr. Valdivias's argument. Mr. Valdivias does not contend that the immigration judge was obligated to

---

[4] In the reply brief and at the September 29, 2020 hearing, counsel for Mr. Valdivias confirmed that he has withdrawn his argument regarding the alleged omission of mistake as one of the possible grounds of appeal, which is argued at page twenty-one of the motion to dismiss. *See* Reply 11 n.2.

United States District Court
Northern District of California

1    inform him that he might be eligible for relief. Rather, Mr. Valdivias argues that the immigration

2    judge cannot affirmatively mislead him about his eligibility for relief. The Court agrees with Mr.

3    Valdivias.

4    When reviewing Mr. Valdivias's criminal record, the attorney for the Government stated

5    that a conviction for conspiracy to cultivate marijuana was an aggravated felony. Removal

6    Hearing Transcript 18–19. The immigration judge then told Mr. Valdivias, "So, it's an aggravated

7    felony and so you are ineligible for any relief or remedy." *Id.* 19. Mr. Valdivias argues this was a

8    legal error because he was eligible for a U-visa notwithstanding his aggravated felony conviction.

9    Mot. 21–22. And this legal error was central to Mr. Valdivias's waiver of this right to appeal.

10   Reply 13. When told by the immigration judge, "If you appeal, the Board of Appeals may let you

11   go free and you won't removed [sic] by expulsion. Do you understand?", Mr. Valdivias

12   responded, in Spanish, "well, like, I don't have any chance there, uh, from what I'm hearing."

13   Removal Hearing Transcript 22. Mr. Valdivias argues this error is analogous to the one that was

14   made in *Cisneros-Rodriguez*, where the Ninth Circuit found a due process violation invalidated a

15   waiver of fundamental rights. *Id.* 22.

16   In *Cisneros-Rodriguez*, Cisneros was placed in an administrative removal proceeding,

17   which was conducted by an Immigration and Customs Enforcement ("ICE") agent. *Cisneros-*

18   *Rodriguez*, 813 F.3d at 752. Without counsel, she signed a Notice of Intent to Issue a Final

19   Administrative Removal Order, admitting the charge of removability and waiving her right to

20   contest it. *Id.* She signed another form admitting to having entered the United States unlawfully

21   fourteen years prior and waiving her right to an attorney. *Id.* Cisneros testified that the ICE agent

22   told her that "a lawyer would not help me, so I did not ask for an attorney." *Id.* at 753. The

23   proceedings took between ten and fifteen minutes. *Id.* at 752. Cisneros testified at an evidentiary

24   hearing that her waivers of her rights to appeal and to counsel had not been "knowing and

25   voluntary" because the ICE agent hadn't followed proper procedures and had affirmatively

26   misadvised her about her right to counsel and the help an attorney could have provided. *Id.* at 753.

27   The Ninth Circuit found that the ICE agent's advice "was not accurate, and had the effect

28   of misleading Cisneros." *Cisneros-Rodriguez*, 813 F.3d at 757. The Ninth Circuit held that "if an

United States District Court
Northern District of California

16

ICE agent erroneously advises an uncounseled alien in an administrative removal proceeding that an attorney will not be able to provide assistance, any waiver of the right to counsel based on that advice is invalid because it is not 'considered and intelligent.'" *Id*. Based on an independent review of the record, the Ninth Circuit concluded that the ICE agent had told Cisneros that an attorney would not help her and thereby persuaded her to waive her right to obtain an attorney. *Id.* at 758. The Ninth Circuit went through the logical conclusions of this fundamental rights violation:

> First, we have little trouble concluding it is plausible that, had Agent Linares not told Cisneros that a lawyer would not help her, she would have been able to apply for a U-visa….We also have no doubt that a competent lawyer would have discovered that she was eligible for one, would have informed ICE, and would thereby have prevented Cisneros's immediate removal from the United States.

*Id.* at 761. The Ninth Circuit reached this conclusion even though it had "no doubt, as the district court concluded, that [the ICE agent] did not know that Cisneros was facially eligible for a U-visa." *Id.* at 761.

Mr. Valdivias's case is analogous. In *Cisneros-Rodriguez*, it was an ICE agent that gave advice that "was not accurate, and had the effect of misleading Cisneros." *Cisneros-Rodriguez*, 813 F.3d at 757. In Mr. Valdivias's case, it was an immigration judge that gave advice that was not accurate and had the effect of misleading Mr. Valdivias. The immigration judge told Mr. Valdivias, point-blank, "you are ineligible for *any* relief or remedy" Removal Hearing Transcript 19 (emphasis added). This was not true, as Mr. Valdivias, like Cisneros, was eligible for a U-visa, as the Court will explain in further detail. Both Cisneros and Mr. Valdivias had been convicted of aggravated felonies, and both remained eligible for a U-visa. *Cisneros-Rodriguez*, 813 F.3d at 751. Mr. Valdivias logically and rationally relied on what the immigration judge told him. This is evident because when the immigration judge asked him if he wanted to appeal, Mr. Valdivias said (in Spanish), "Well, like, I don't have any chance there, uh, from what I'm hearing." Removal Hearing Transcript 22.

*Cisneros-Rodriguez* teaches that when a noncitizen in removal proceedings is affirmatively

1   misled about the possibility of relief by the hearing officer or immigration judge, it does not matter

2   if that relief was evident on the face of the record. *See Cisneros-Rodriguez*, 813 F.3d at 761 ("We

3   have no doubt, as the district court concluded, that Linares [the ICE agent] did not know that

4   Cisneros was facially eligible for a U-visa."). For this reason, the Government's arguments about

5   the obligations of an immigration judge regarding advising a noncitizen of eligibility for relief are

6   inapposite in a situation where an immigration judge has affirmatively misled a noncitizen.

7   The Government's argument rests on cases that interpret 8 C.F.R. § 1240.11(a)(2) or the

8   analogous provision then in effect.[5] Under 8 C.F.R. § 1240.11(a)(2), "An IJ is required to inform a

9   petitioner subject to removal proceedings of "apparent eligibility to apply for any of the benefits

10   enumerated in this chapter." *C.J.L.G. v. Barr*, 923 F.3d 622, 626 (9th Cir. 2019) (quoting 8 C.F.R.

11   § 1240.11(a)(2)). "The 'apparent eligibility' standard of 8 C.F.R. § 1240.11(a)(2) is triggered

12   whenever the facts before the IJ raise a 'reasonable possibility that the petitioner may be eligible

13   for relief.'" *Id.* at 627 (citing *Moran-Enriquez v. INS*, 884 F.2d 420, 423 (9th Cir. 1989)).[6] The

14   Court does not disagree with the Government. Neither does Mr. Valdivias. *See* Reply 12–13.

15   However, the Government's string citation of twelve cases to emphasize this point is not

16   responding to the argument Mr. Valdivias is making. *See* Opp'n 8–9. Mr. Valdivias does not argue

17   that the obligations of 8 C.F.R. § 1240.11(a)(2) were triggered in his case, requiring the

18   immigration judge to inform him of his eligibility for a U-visa. Rather, Mr. Valdivias argues that

19   the immigration judge was required, under due process, to not give advice that was not accurate

20   and had the effect of misleading him. *See Cisneros-Rodriguez*, 813 F.3d at 757 ("However, as we

21   explain below, [the ICE agent's] advice was not accurate, and had the effect of misleading

22   Cisneros."). When the immigration judge told Mr. Valdivias, "So, it's an aggravated felony and so

23

24   _____

   [5] The substance of former 8 C.F.R. 242.17(a) can now be found at 8 C.F.R. 1240.11(a)(2).
25   *Valencia v. Mukasey*, 548 F.3d 1261, 1263 (9th Cir. 2008).

26   [6] The Ninth Circuit has held that this duty to inform the noncitizen of "apparent eligibility" to
   apply for certain relief is mandatory, and the failure of the immigration judge to do so when
27   required "is a denial of due process that invalidates the underlying deportation proceeding."
   *United States v. Vidal-Mendoza*, 705 F.3d 1012, 1015 (9th Cir. 2013) (quoting United *States v.*
28   *Muro–Inclan*, 249 F.3d 1180, 1183–84 (9th Cir. 2001)). As the Court explains, 8 C.F.R. §
   1240.11(a)(2) is not applicable in this case.

1   you are ineligible for any relief or remedy," this was a legal error in violation of his due process

2   rights. *See Cisneros-Rodriguez*, 813 F.3d at 751–2 ("She was told by the Immigration and

3   Customs Enforcement ("ICE") agent who conducted the proceeding that, because she had been

4   convicted of an aggravated felony, an attorney could not help her."). *Cisneros-Rodriguez* does not

5   mention 8 C.F.R. § 1240.11(a)(2) because it isn't applicable. The same is true in this case.

6        The Government cites *United States v. Leon-Paz* in its string citation. 340 F.3d 1003 (9th

7   Cir. 2003). The Court does not find this case to weaken Mr. Valdivias's arguments. In *Leon-Paz*,

8   the Ninth Circuit vacated the defendant's conviction for unlawful reentry under 8 U.S.C. §

9   1326(a). *Id.* at 1004. The Defendant collaterally attacked the removal order upon which his

10  prosecution was based by showing that his waiver of his right to appeal was invalid because the

11  immigration judge told him he "was not eligible for relief" from removal. *Id.* at 1005. The Ninth

12  Circuit stated, "But the waiver cannot have been valid if the record contains an inference that he

13  was eligible for relief, but the IJ misadvised him to the contrary." *Id.* (internal footnote omitted).

14  The Ninth Circuit does not detail what exactly was in the record in front of the immigration judge

15  or any other facts from the removal proceedings. Instead, the Ninth Circuit traces the history of

16  how the immigration laws had changed since the Defendant, a legal permanent resident, pled

17  guilty to first-degree burglary in 1995 to the current moment. *Id.* at 1005–07. Ultimately the Ninth

18  Circuit cited to *INS v. St. Cyr*, 533 U.S. 289, 121 (2001) and found the repeal of a statute

19  authorizing relief for noncitizens convicted of aggravated felonies, 8 U.S.C. § 1182(c) ("212(c)"),

20  could not be retroactively taken away from noncitizens who had entered pleas while that relief was

21  possible. *Id.* at 1006. The question the Ninth Circuit focused on was as follows: "We must,

22  therefore, ask whether the IJ's advice was correct. As we will show, it was not." *Id.* at 1005.

23       The Government wants this Court to read into *Leon-Paz* a holding that is not there and

24  would conflict with *Cisneros-Rodriguez*: If an immigration judge affirmatively misleads a

25  noncitizen by telling him he is ineligible for relief, it is only a due process violation if his

26  eligibility was clear in the record before the immigration judge. *Cisneros-Rodriguez* holds the

27  opposite, as the Ninth Circuit explicitly stated, "We have no doubt, as the district court concluded,

28  that Linares [the ICE agent] did not know that Cisneros was facially eligible for a U-visa," 813

1    F.3d at 761, but still found a due process violation.

2         At oral argument, the Government relied on *United States v. Pallares-Galan*, 359 F.3d

3    1088 (9th Cir. 2004). This case was not cited in the Government's opposition, but the Court will

4    address it. *Pallares-Galan* is another case in which the Ninth Circuit overturned a conviction of

5    unlawful reentry under 8 U.S.C. § 1326 due to erroneous advice by the immigration judge. The

6    Court does not find this case analogous to Mr. Valdivias's case.

7         Like in *Leon-Paz*, the noncitizen in *Pallares-Galan* was told he was ineligible for relief

8    when he was, in fact, eligible for relief under the successor provision to 212(c),[7] the provision at

9    issue in *Leon-Paz*. *Id.* at 1096. In *Pallares-Galan*, the Ninth Circuit employed the *Taylor*

10   categorical approach and found that the immigration judge misclassified a California misdemeanor

11   as an aggravated felony. Thus, her statement to Pallares that, "I cannot consider your application

12   for cancellation of removal, because cancellation of removal requires that a person not be

13   convicted of an aggravated felony. So my decision would be that you are not eligible for

14   cancellation," was in error. *Id.* at 1093. Like in *Leon-Paz*, the Ninth Circuit focused on the error

15   the immigration judge made. The Ninth Circuit did the same in *Cisneros-Rodriguez* as well. The

16   Court finds nothing in *Pallares-Galan* that conflicts with *Cisneros-Rodriguez* and its holding that

17   affirmatively misadvising a noncitizen about his eligibility for relief is a due process violation.

18        Other cases the Government cites are inapposite as well. In *Valencia*, "the IJ expressly

19   found that Valencia *did not appear to be eligible* for any relief from removal." 548 F.3d at 1262

20   (emphasis added). This immigration judge avoided the exact error the immigration judge made in

21   Mr. Valdivias's case. In *Vidal-Mendoza*, the noncitizen argued for a standard that would have

22   "require[d] an IJ to give an alien the opportunity to make application for relief that was not

23   available during the hearing." 705 F.3d at 1018. Of course the Ninth Circuit found this "plainly

24   illogical." *Id.* Mr. Valdivias is not arguing that the immigration judge errored by failing to inform

25

26   _____

27   [7] "Under IIRIRA, Congress eliminated suspension of deportation, INA § 212(c), and replaced it with 'cancellation of removal,' INA § 240A; 8 U.S.C. § 1229b, which retained the same standards for relief. *Pallares-Galan*, 359 F.3d at 1092 n.2 (citing *Pablo v. INS*, 72 F.3d 110, 113 (9th Cir. 1995) (listing the factors considered in granting discretionary relief under Section 212(c) of the former INA)).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

him "of a future interpretation of the law." *Id.* He is arguing, correctly, that the immigration judge cannot lawfully tell him he is "ineligible for any relief or remedy" when that is not true under the law as it currently stands.

Counsel for Mr. Valdivias identified at oral argument that, of the cases the Government relies most heavily, none of them postdate *Cisneros-Rodriguez*. The Government briefly cites two cases that postdate *Cisneros-Rodriguez*: *United States v. Morelos-Navarro*, 742 F. App'x 226, 228 (9th Cir. 2018), and *C.J.L.G. v. Barr*, 923 F.3d 622, 626 (9th Cir. 2019). *Morelos-Navarro* did not involve an affirmative misstatement. In that case, the immigration judge never advised the noncitizen of his right to counsel or of the availability of pro bono counsel and only asked him if he wanted his "case postponed to get an attorney or for any other reason." *Morelos-Navarro*, 742 F. App'x at 228. *C.J.L.G.* involved a minor whose record before the judge indicated that he was eligible for Special Immigrant Juvenile status, which would have provided him deportation relief. 923 F.3d at 627. *C.J.L.G.*, and the "apparent eligibility" standard of 8 C.F.R. § 1240.11(a)(2) that is triggered whenever the facts before the immigration judge raise a "reasonable possibility that the petitioner may be eligible for relief," 923 F.3d at 627, are distinguishable from Mr. Valdivias's case. Mr. Valdivias does not argue that the immigration judge should have been able to tell from his record that he might be eligible for a U-visa and thus advise him of that eligibility. Rather, Mr. Valdivias's claim is that the immigration judge affirmatively misled him about the possibility of deportation relief when he erroneously told him, "*you are ineligible for any relief or remedy*." Removal Hearing Transcript 19 (emphasis added). Mr. Valdivias relied on this error when he waived his right to appeal— "well, like, I don't have any chance there, uh, from what I'm hearing." Removal Hearing Transcript 22. This, Mr. Valdivias argues, invalidated his waiver of appeal because the waiver was not considered and intelligent.

In contrast to the Government's arguments, another case that postdates *Cisneros-Rodriguez*, *United States v. Trinidad Hernandez*, 759 F. App'x 590 (9th Cir. 2018), lends some support to the arguments Mr. Valdivias has made here. In *Trinidad Hernandez*, the Ninth Circuit considered *Cisneros-Rodriguez* and assumed without deciding that an immigration judge telling a noncitizen that "her 'deportation is required' and that there was 'no relief from deportation' when,

in fact, she could have applied for a U-visa" violated her due process rights. *Id.* at 592. As the Court has stated, the due process violation against Mr. Valdivias flows from the Ninth Circuit's decision in *Cisneros-Rodriguez*: regardless of whether the hearing officer knew that the noncitizen was eligible for a U-visa or not, affirmatively stating that an aggravated felony conviction barred the noncitizen from any relief or remedy is legal error, invalidates any waiver of the right to counsel or appeal, and constitutes a violation of due process that invalidates the underlying removal order upon which a charge of unlawful reentry under 8 U.S.C. § 1326(a) relies. Accordingly, the Court finds a violation of due process.

### 2. Conclusion

The Court finds that the Government has failed to meet its burden to establish a valid waiver of the right to appeal by clear and convincing evidence. Due to the immigration judge's legal error regarding Mr. Valdivias's eligibility for relief from deportation, his waiver of his right to appeal was not considered and intelligent. Therefore, the 2012 removal order violated his due process rights. The Court next considers whether Mr. Valdivias suffered prejudice as a result of the violation.

### C. Prejudice

The Court finds that Mr. Valdivias has satisfied the prejudice requirement of Section 1326(d)(3) because he has plausibly alleged that he was eligible for a U-visa based on the assault he suffered in 2002 and his subsequent cooperation with the East Palo Alto police. The Government does not contest that Mr. Valdivias was eligible for a U-visa at the time of his 2012 deportation.

To establish prejudice, Mr. Valdivias "does not have to show that he actually would have been granted relief. Instead, he must only show that he had a 'plausible' ground for relief from deportation." *Ubaldo-Figueroa*, 364 F.3d at 1050. "Establishing plausibility requires more than establishing a mere possibility." *Cisneros-Rodriguez*, 813 F.3d at 761 (internal quotation marks, citation, and brackets omitted). However, relief need not be "probable." *Id.* (internal citation omitted). In sum, Mr. Valdivias needs to show that relief was more than "possible," but he need not show that it was "probable." *Id.* "The burden is not a heavy one—the defendant 'need only

United States District Court
Northern District of California

1    establish some evidentiary basis on which relief could have been granted.'" *United States v.*

2    *Aguilar-Moya*, No. 17-CR-00015-BLF-1, 2018 WL 3659304, at *6 (N.D. Cal. Aug. 2, 2018)

3    (quoting *United States v. Raya-Vaca*, 771 F.3d 1195, 1207 (9th Cir. 2014), *abrogated on other*

4    *grounds* by *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020)).

5           Mr. Valdivias argues that he was prejudiced because it is plausible that he could have

6    obtained a U-visa at the time of his 2012 deportation. Mot. 14–19. The Court agrees.

7           **1. U-visa Requirements**

8           Congress created the U-visa for certain victims of criminal activity with the enactment of the

9    Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. 106-386, 114

10   Stat. 1464 (2000); *see also Cisneros-Rodriguez*, 813 F.3d at 760. The U-visa confers temporary

11   nonimmigrant status, employment authorization, and a path to adjustment to lawful permanent

12   resident status. *See* Ex. E, Decl. of Helen Lawrence ("Lawrence Decl.") ¶ m, ECF 38–2; 8 U.S.C.

13   § 1255(m); 8 C.F.R. § 245.24(b). To establish prima facie eligibility for a U-visa, Mr. Valdivias

14   must submit evidentiary proof that he meets the following criteria: (1) he has suffered substantial

15   physical or mental abuse in connection with a qualifying crime; (2) he possesses information

16   concerning the crime; (3) he has been helpful, is being helpful, or is likely to be helpful to an

17   official who is investigating or prosecuting the crime; and (4) the qualifying crime violated federal

18   or state law. *See Cisneros-Rodriguez*, 813 F.3d at 759 (citing 8 U.S.C. § 1101(a)(15)(U)(i)). A U-

19   visa applicant must also obtain a certification from a law enforcement official in order to qualify

20   for the visa. *Id.* (citing 8 C.F.R. § 214.14(c)(2)(i)). The list of qualifying crimes includes felonious

21   assault. 8 U.S.C. § 1101(a)(15)(U)(iii). It does not matter if the perpetrator of the crime was

22   ultimately arrested, charged or convicted—Congress "intended to 'strengthen the ability of law

23   enforcement agencies to detect, investigate, and prosecute' all qualifying crimes, not merely those

24   crimes that the government might conclude in retrospect, and in the context of later litigation, are

25   significant." *Cisneros-Rodriguez*, 813 F.3d at 762 (citing Pub. L. No. 106–386, § 1513(a)(2)(A));

26   Lawrence Decl. ¶ d. The 2002 assault with a deadly weapon Mr. Valdivias suffered in East Palo

27   Alto is a qualifying crime. East Palo Alto Police Report 59. Mr. Valdivias meets the four

28   requirements as outlined by the applicable statute.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1     To determine where Mr. Valdivias suffered substantial abuse, the applicable regulation

2 provides a non-exhaustive list of criteria, including, "[t]he nature of the injury inflicted or

3 suffered; the severity of the perpetrator's conduct; the severity of the harm suffered; the duration

4 of the infliction of the harm; and the extent to which there is permanent or serious harm to the

5 appearance, health, or physical or mental soundness of the victim, including aggravation of pre-

6 existing conditions. No single factor is a prerequisite to establish that the abuse suffered was

7 substantial." 8 C.F.R. § 214.14(b)(1).

8     As documented in his medical records, Mr. Valdivias suffered a fractured skull and

9 required staples in the emergency room as a result of the assault. Medical Records 11–12. This

10 injury resulted in a traumatic brain injury. Peery Report 42–43. Mr. Valdivias suffers cognitive

11 deficits that impact his functioning and decision making that stem from his 2002 attack. *Id.* 43–44.

12 He lacks that attentional focus and working memory to understand complex information. *Id.* 43.

13 His multitasking abilities are too limited to deliberate among options when engaging in novel or

14 complex problem solving. *Id.* Accordingly, the Court finds that Mr. Valdivias has suffered

15 substantial abuse.

16     Mr. Valdivias also possessed information about the crime and helped the East Palo Alto Police

17 in the investigation of the crime. While in the hospital, records show that Mr. Valdivias was

18 interviewed by the East Palo Alto Police. Medical Records 18. The East Palo Alto Police

19 Department still maintains a two-page summary of the incident. East Palo Alto Police Report 59–

20 60. As for obtaining the required certification from law enforcement, the law does not require that

21 Mr. Valdivias have the certification in hand to demonstrate prejudice under § 1326(d)—only that

22 he needs the certification in order to ultimately obtain a U-visa. *See, e.g., Cisneros-Rodriguez*, 813

23 F.3d at 753 (finding that defendant was facially eligible for a U-visa before she obtained law

24 enforcement certification, and granting her relief because she could have plausibly obtained one at

25 the time of her removal proceedings); *Aguilar-Moya*, 2018 WL 3659304, at *7 (finding Defendant

26 facially eligible for U-visa without having the required certification in hand); *United States v.*

27 *Cervantes*, No. CR 16-054-DSF, 2016 WL 6472108 (C.D. Cal. Aug. 1, 2016) (granting relief

28 because defendant could have plausibly obtained a U-visa at the time of her removal proceedings

with no reference to whether she had subsequently obtained law enforcement certification); *see also* Lawrence Decl. ¶ r (reporting that U-visas have been granted to individuals who only call the police to report a crime and also individuals who were interviewed in the hospital by the police regarding cases that did not result in an arrest). Accordingly, the Court finds that Mr. Valdivias possesses information concerning the qualifying crime and that he has been helpful to law enforcement investigating the crime.

As the Court noted previously, the 2002 assault with a deadly weapon Mr. Valdivias suffered in East Palo Alto is a qualifying crime. East Palo Alto Police Report 59. Thus, the Court finds that Mr. Valdivias has met the four requirements to establish *prima facie* eligibility for a U-visa.

### 2. Waiver of Inadmissibility

In addition to meeting the *prima facie* requirements for a U-visa, Mr. Valdivias must establish that it was plausible that he would have been granted relief. To do this, he must establish that, in 2012, he was admissible to the United States or that any ground of inadmissibility could have plausibly been waived. 8 C.F.R. 214(a)(3)(i). The Court finds that Mr. Valdivias has plausibly alleged he would have been granted a waiver either under 8 U.S.C. § 1182(d)(14), a provision specific to U-visa applicants, or 8 U.S.C. 1182(d)(3)(A)(i), the general nonimmigrant waiver provision.

"Most U-visa applicants require a waiver of some ground or grounds of inadmissibility precisely because they are undocumented and seeking status." Lawrence Decl. ¶ l. Further, the U-visa is often characterized as having one of the most forgiving waiver standards as compared to other forms of immigration relief. *Id.* "According to data compiled by DHS, USCIS ultimately grants over 70 percent of U-visa applications." *Cisneros-Rodriguez*, 813 F.3d at 761. "Though statistics alone cannot establish the plausibility of relief, the data provides a reasonable baseline against which to assess the plausibility of relief." *Id.* (internal quotation marks and citation omitted).

Measured against this baseline, the Court finds it plausible that Mr. Valdivias would have obtained the necessary waiver. Under the U-visa-specific waiver provision, a waiver of inadmissibility may be granted if the Secretary of Homeland Security determines that it is "in the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  public or national interest to do so." 8 U.S.C. § 1182(d)(14). Under the general waiver provision,

2  there is a three-factor balancing test to weigh for admission: the risk of harm to society if the

3  applicant is admitted, the seriousness of the prior immigration and criminal law violations, and the

4  applicants reasons for wanting to enter the United States. *Matter of Hranka*, 16 I. & N. Dec. 491,

5  492 (BIA 1978). The waiver is not limited to humanitarian or "exceptional" cases. Lawrence Decl.

6  ¶ j. In *Cisneros-Rodriguez*, the noncitizen had "a substantial criminal record," with "a variety of

7  state misdemeanors and felonies," including a conviction of two counts of possessing a controlled

8  substance for sale resulting from selling methamphetamine. *Cisneros-Rodriguez*, 813 F.3d at 751–

9  52, 762. In spite of this (and the actual denial of her U-visa application), the Ninth Circuit found it

10  plausible that Cisneros could have obtained a waiver and cited the fact that she had lived in the

11  United States for most of her life, was married to a U.S. citizen, and had two children who were

12  U.S. citizens as factors warranting favorable discretion. *Id.* at 762; *see also United States v.*

13  *Aceves-Trejo*, No. 18-7597 PSJ, 2019 W: 1244270, at *4 (C.D. Cal 2019) (finding U-visa

14  plausible for noncitizen with four different felonies and four misdemeanors, including two that

15  resulted in sentences of longer than one year); *Cervantes*, 2016 WL 6472108, at *4 (finding

16  waiver plausible despite "substantial" criminal records including convictions in a gang-related

17  drug trafficking conspiracy resulting in a sentence of 37 months imprisonment and a 15-year term

18  of supervised release); *Raya-Vaca*, 771 F.3d at 1207 (finding a compelling humanitarian interest

19  in keeping families united and weighing this in favor of granting relief when noncitizen's partner,

20  children, and family lived in the United States). Here, Mr. Valdivias was convicted of a much less

21  serious felony—a nonviolent crime that would be a misdemeanor today—and has primarily

22  resided in the U.S. since 1999, nearly half his life, and three of his children are U.S. citizens.

23  Lawrence Decl. ¶ 4; Mot. 5–6. He has a long history of employment in the United States and has

24  dedicated his life to taking care of his family. Lawrence Decl. ¶¶ u, v, z. Accordingly, the Court

25  finds it plausible that Mr. Valdivias could have acquired the necessary waiver to render him

26  admissible to the United States.

27  **3.  Conclusion**

28  Based on the foregoing, the Court finds that Mr. Valdivias has satisfied the requirements of

8 U.S.C. § 1326(d) because his due process rights were violated in his removal proceedings and he was prejudiced by this violation.

**IV.   ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that the indictment against Mr. Valdivias is DISMISSED.

Dated:  November 9, 2020

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

27